**PLASTI–LINE
MANUFACTURING COMPANY**

v.

**COMBINED COMMUNICATIONS COR-
PORATION and Tencon, Inc.**

**Civ. No. 3–88–238.**

United States District Court,
E.D. Tennessee, N.D.

Oct. 25, 1989.

Bernard E. Bernstein of Bernstein, Susano & Stair, Knoxville, Tenn., for plaintiff.

Bruce Guyton of Baker, Worthington & Crossley, Knoxville, Tenn., for defendants.

MEMORANDUM OPINION

HULL, Chief Judge.

This is an action for breach of certain warranties and representations made in an asset sale agreement. It came to trial, without intervention of a jury, on September 26 and 27, 1989. Final arguments were heard on October 6, 1989. The following opinion contains the Court's findings of fact and conclusions of law.

Plasti–Line Manufacturing Company [Plasti–Line], a publicly-held Tennessee corporation engaged in the manufacture of

outdoor signs, first attempted to purchase its competitor, Tencon, Inc., [Tencon] in 1985. Tencon (which no longer exists as a separate corporate entity) was then owned by Combined Communications Corporation, a subsidiary of Gannet, Inc. After an extended and thorough "due diligence" investigation of Tencon's facility and its operations, purchase negotiations broke down because Gannet was inflexible about the sale price. However, in June of 1987, Gannet again expressed an interest in selling Tencon to Plasti–Line. Plasti–Line's President James R. Martin went to New York and met with Don W. Davidson, President of Gannet Outdoor Division. He was offered the company under very rigid terms. He was advised that Gannet would only consider selling Tencon for a set, non-negotiable price; that Plasti–Line would not be permitted another "due diligence" investigation at the Tencon plant; that, in fact, Plasti–Line was not to contact *any* Tencon employees prior to the sale; that, after a confidentiality agreement was signed, Gannet would furnish Plasti–Line with Tencon's financial statements; that Plasti–Line would have to rely on these statements in determining whether or not to make the purchase and could not review Tencon's books or have them audited prior to the sale; and that the sale must be concluded quickly or the offer would be withdrawn. It was agreed that, after the deal was effected, Gannet's outside auditor, Price Waterhouse, would audit the assets involved as of the date of closing and account for the approximately two additional months of Tencon's operations between the June 30th date on its financial statements and the actual closing date. Mr. Martin accepted Gannet's terms, signed the confidentiality agreement, and was furnished with Tencon's year-end financial statements for 1985 and 1986, as well as its year-to-date report ending June 30, 1987, and its estimated earnings for 1987. The financial records indicated sales of Twenty–One Million Nine Hundred Thousand Dollars in 1985 and Twenty–Three Million Six Hundred Thousand Dollars in 1986, with continued growth predicted for 1987. Plasti–Line already had knowledge of Tencon's 1984 and 1985 earnings from its previous attempt to purchase the company.

There is no question that the sale price was to fall just under Fifteen Million Dollars and that this figure was about Three Million Dollars over Tencon's actual book value. Two Million Dollars of this purchase price was to be allocated to a covenant not to compete.

Plasti–Line's officials testified that they wanted to purchase Tencon because of its proven sales and earnings records, because the purchase would increase Plasti–Line's production capacity, and because the purchase would give Plasti–Line a greater share in the outdoor sign market, particularly with regard to signs for the fast food industry. Because the purchase was going to take up all of Plasti–Line's borrowing capacity, it was very important to its board of directors that Tencon's projected stream of income would be sufficient to permit servicing of the not inconsiderable debt. All of the plaintiff's witnesses testified that Tencon's growing rate of earnings was an important factor in the purchase decision and in their willingness to pay the price Gannet offered. Plasti–Line's staff prepared a "worst case" scenario projecting a steady (not increasing) stream of income from Tencon based on a figure that was an average of its 1985 and 1986 earnings as reported in its financial statements. Apparently, even in the "worst case" scenario, the purchase of Tencon looked attractive. However, there is no doubt that Plasti–Line assumed Tencon's earnings would not follow the "worst case" prediction, but would continue to grow in accordance with the apparent earnings trend.

In July of 1987, Mr. Martin made an attempt to negotiate a lower purchase price. However, after his offer was rejected, Plasti–Line's board authorized the purchase at the Fifteen Million Dollar Price. Mr. Martin signed the Tencon Asset Sale Agreement on August 27, 1987.

Shortly after this agreement had been entered, Price Waterhouse began the purchase price audit to determine final closing price adjustments. Because Plasti–Line was a publicly-held corporation, it was re-

quired to file an 8K report with the Securities and Exchange Commission which needed to include audited financial statements for Tencon's two preceding years of operations, or 1985 and 1986. Initially, Price Waterhouse was engaged to perform this audit as well. However, sometime in the month of September 1987, the firm of Lattimore, Black, Morgan & Cain [Lattimore, Black] was engaged to work on the 1985 and 1986 audits while Price Waterhouse continued work on the purchase price adjustments. In the course of its work, Price Waterhouse discovered that Tencon routinely carried over sales completed in one month to bill in the next month. This practice required an adjustment to the accounts receivable represented by those sales as between Plasti–Line and Tencon. Price Waterhouse brought this practice to the attention of Lattimore, Black whose auditors eventually discovered a massive carryover of sales between the months of December of 1985 and January of 1986. This required an adjustment to Tencon's reported sales and earnings in the amount of $2,158,000.00 which had to be shifted from 1986 back to 1985. There is no question that, after the audit had corrected Tencon's annual financial statements, Tencon had more earnings in 1985 than it did in 1986. The apparent trend of growing sales which Plasti–Line had relied upon in making its purchase decision was incorrect.

Although Plasti–Line was fully aware of this fact by the end of October of 1987, it chose not to raise the issue before the final closing with Gannet in December. After the closing, however, it filed the instant lawsuit, charging, correctly, that Gannet had breached the purchase agreement by incorrectly warranting that its financial statements had been prepared in compliance with generally accepted accounting principles. Although Gannet initially disputed this charge, by the time of trial it had conceded that the financials offered Plasti–Line to induce it to purchase Tencon had not been accurate and that some sales made in 1985 had been improperly recognized in 1986.

■ Given the acknowledged fact that the terms of the purchase agreement had been breached, the first issue for the Court to address was whether or not this breach was material. The Court FINDS that the breach *was* material. Plasti–Line was forced to make its purchase decision without a second "due diligence" investigation and without audited financial records for Tencon. All of Plasti–Line's witnesses testified that Tencon's apparent trend of growth in its annual sales was central to its decision to purchase the company. There is no question that Plasti–Line had a right to accurate financial records for Tencon and that it did not get them.

■ The second issue, and the most important one, was whether or not Plasti–Line was damaged by this breach. It was Plasti–Line's position at trial that it paid too much for Tencon. It argued that, if it had known that Tencon's sales in 1986 were less than those in 1985, in other words that Tencon's sales had a downward rather than upward apparent trend, it would not have been willing to pay the fifteen million dollar price demanded.

While this may be true, there is no indication that Gannet was willing to negotiate the price. The price was inflexible when Plasti–Line attempted to purchase Tencon in 1985, and it was inflexible in 1987. Tencon was offered on a take-it-or-leave-it basis. Once under these circumstances, Plasti–Line apparently left it. However, there was nothing to indicate that it would have left it in 1987. It wanted to buy Tencon and was willing to do it at the price offered as long as the projected income stream was sufficient for Plasti–Line to service the additional debt. The Court is of the firm impression that, had both parties been operating with accurate financial statements for Tencon, Gannet would not have come down on the price and Plasti–Line would have purchased Tencon anyway; however, there is no way to know for certain what would have happened.

Plasti–Line contended at trial that it had paid about Three and One–Half Million Dollars more than it should have for Tencon. It reached this figure by calculating Ten-

con's apparent price-earnings ratio (as a measure of its apparent value) based on the incorrect financials, which was 11.5 and its price/earnings ratio based on 1986's corrected statement, which was 14.6, and comparing these figures with Plasti–Line's own price/earnings ratios from the relevant time period which ranged from 10.8 to 13.5. Its actual calculations, using these different ratios, are found on Exhibits 31 and 33.

The Court is aware that the price/earnings ratio is a valid measure of a company's worth and that if Plasti–Line had relied upon the 11.5 ratio in making its purchase decision, it would have been much more optimistic about Tencon's earnings than if it had relied upon the 14.6 figure. However, there is no indication that it relied upon any price/earnings ratio at all. These figures were calculated after the fact as a way of determining what Tencon appeared to be worth in comparison to what it was actually worth as a measure of damages. These calculations do, in fact, suggest what earnings Plasti–Line *might have suffered* in relying on incorrect financial statements but there was no proof that, in fact, it did suffer this loss.

 The purpose of damages is to put the injured party, in this case Plasti–Line, in as good a position as it would have been in if the breach of warranty had not occurred. It is to give Plasti–Line the benefit of its bargain—not more and not less.

There was no evidence at trial that Tencon's assets, as represented prior to the purchase, turned out to be worth less than stated. Presumably, then, the Twelve Million Dollar value placed on these assets was correct.

There was no evidence that, after Tencon's stream of income was added to Plasti–Line's, Plasti–Line's price/earnings ratio exceeded its usual range (although this might have been expected if predictions made upon Tencon's true price/earnings ratio had actually come about). In fact, there is every indication that Plasti–Line's corporate value suffered no loss whatsoever after the Tencon purchase.

In the Court's opinion, Plasti–Line's calculation of its damages based on what could be inferred from the apparent and actual price/earnings of Tencon in 1986 are simply projections of what it might have lost. They are predictions based on valid methods of calculating corporate worth which did not turn out to be true. Plasti–Line might have suffered considerable harm from relying on incorrect financial statements, but, in fact, it did not.

As far as the Court can tell, all that Plasti–Line lost in the bargain was a good negotiating argument to use in trying to lower a non-negotiable price. While Plasti–Line proved absolutely that the defendant breached a material term of the purchase agreement, it has failed to carry its burden of proof that it suffered any actual damages as a proximate result.

Accordingly, judgment will enter on behalf of the defendants and the plaintiff will take nothing on its claim.